**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

**WESTERN MOTORCOACH, INC.**                                    **CIVIL ACTION**

**VERSUS**                                                                  **NO. 26-397**

**AMERICAN SAFETY, LLC, et al.**                              **SECTION "G"(3)**

<u>**ORDER AND REASONS**</u>

Before the Court is Plaintiff Western Motorcoach, Inc.'s ("Western") Motion for Preliminary Injunction.[1] Western seeks a preliminary injunction against Defendants American Safety LLC ("AMS"), American Safety Transit, LLC ("AST"), Anaken Holdings, LLC ("Anaken"), Western Motorcoach, LLC, and Kenneth Begovich (collectively, the "Begovich Entities").[2] Western is a bus transportation company based in Houston, Texas. This case arises from the failed acquisition of Western by Defendant Kenneth Begovich, and interim business dealings between Western and Mr. Begovich. Western brings numerous claims against the Begovich Entities, and Defendants Jason Cash, The Bus Coach, LLC, and Charabanc, LLC.[3] However, Western focuses on two claims against the Begovich Entities in the instant motion—breach of fiduciary duty and breach of a Non-Disclosure Agreement.[4] Western moves for a

---

[1] Rec. Doc. 1.

[2] *Id.*

[3] Rec. Doc. 3.

[4] Rec. Doc. 1-2 at 9. In the motion for a preliminary injunction, Western also discusses the substantial likelihood of success on the merits of its misappropriation of trade secrets claim. However, Western did not present any argument on that claim at the preliminary injunction hearing. Western also did not brief the trade secret's claim in its Proposed Findings of Fact and Conclusions of Law. Rec. Doc. 40. Therefore, the Court does not address the trade secrets claim.

preliminary injunction against the Begovich Entities.[5] The Begovich Entities oppose the motion.[6]

A hearing on a motion for temporary restraining order was held on February 26, 2026. There, the parties agreed to eight stipulations to maintain the status quo, until the preliminary injunction hearing. On March 5, 2026, and March 6, 2026, the Court held an evidentiary hearing and oral argument on the Motion for Preliminary Injunction.[7] Considering the motion, the memoranda in support and in opposition, the record, the applicable law, and the evidence presented during the hearing, the Court denies the motion. This Order serves as the Court's findings of fact and conclusions of law.

### I. Procedural Background

On February 24, 2026, Western filed a Motion for a Temporary Restraining Order and Preliminary Injunction in this Court, but Western failed to file a Complaint.[8] On February 25, 2026, Western filed the Complaint and the case was randomly allotted to this Section.[9] The Court held a hearing on the temporary restraining order on February 26, 2026.[10] During the TRO hearing, the parties entered eight stipulations, which they agreed would remain in effect until a March 5, 2026, Preliminary Injunction Hearing.[11] Therefore, the Court denied the motion for a temporary

---

[5] Rec. Doc. 1. The instant motion seeks injunctive relief against all Defendants, but during oral argument Western withdrew its request for injunctive relief against Defendants Jason Cash, The Bus Coach, LLC, and Charabanc, LLC.

[6] Rec. Doc. 7.

[7] Rec. Docs. 27, 28.

[8] Rec. Doc. 1.

[9] Rec. Docs. 2, 3.

[10] Rec. Doc. 10.

[11] Rec. Docs. 6, 13. At the TRO hearing Western confirmed that it was not seeking injunctive relief against Cash Defendants.

restraining order in lieu of the stipulations.[12]

The Court held an evidentiary hearing and oral argument on the motion for preliminary injunction from March 5, 2026, to March 6, 2025.[13] On March 19, 2026, Western and the Begovich Entities both submitted proposed findings of fact and conclusions of law.[14]

## II. Findings of Fact

1. Western is a Houston-based motorcoach charter bus company.[15]

2. Western is a closely held entity whose sole shareholder is Hoa Bao.[16]

3. Harry Bao is Hoa Bao's son and has worked at Western for approximately nine years, during which time he has handled Western's day-to-day operations as its Director of Operations.[17]

4. In early 2025, Mr. Begovich initiated discussions with Western about a potential acquisition of Western's business.[18]

5. Prior to these discussions Western maintained a fleet of approximately 55 vehicles, employed approximately 100–125 people, and allegedly generated $12–15 million in annual revenue.[19]

6. On or about April 16–17, 2025, the parties executed a Confidentiality and Non-Disclosure

---

[12] Rec. Doc. 6.

[13] Rec. Docs. 27, 28.

[14] Rec. Docs. 39, 40.

[15] Mar. 5, 2026, PI Hearing Tr. at 8:16–17.

[16] Rec. Doc. 1-3 at 1.

[17] *Id.*

[18] Mar. 5, 2026, PI Hearing Tr. at 52:2–10.

[19] *Id.* at 50:3–13.

Agreement ("NDA") to facilitate due diligence for a possible acquisition.[20]

7. The NDA states that the parties "expect to commence commercial discussions regarding a proposed transaction."[21]

8. The NDA Section 1 defines "Confidential Information" as information exchanged "in connection with the Proposed Transaction."[22]

9. The NDA further states that confidential information may be used "only for the purpose of evaluating, negotiating, or fulfilling the terms of the Proposed Transaction and for no other purpose."[23]

10. Western disclosed financial records, customer lists, driver information, and operational data.[24]

11. The NDA does not contain a non-compete provision.[25]

12. The NDA provides that it "does not create and is not evidence of a joint venture, partnership, agency or other similar relationship between the Parties," that "nothing herein or otherwise will restrict either Party or its affiliates from competing with the other Party and its affiliates," "there is no fiduciary relationship or other implied obligation," and that "nothing in this Agreement creates any exclusive dealing arrangement between the Parties and their affiliates."[26]

---

[20] Pl.'s Ex. 1.

[21] *Id.* at 2.

[22] *Id.*

[23] *Id.* at 4.

[24] Mar. 5, 2026, PI Hearing Tr. at 54:1–15.

[25] Pl.'s Ex. 1.

[26] *Id.* at 7.

13. Section 11 of the NDA provides that, "the Disclosing Party *may* suffer irreparable injury if the Receiving Party or any of its Representatives were to violate any provision of this Agreement."[27]

14. The NDA does not provide that either party is entitled to equitable relief (specifically injunctive relief) for breach of contract.[28]

15. Prior to Mr. Begovich's engaging in discussions with Western, Western was experiencing financial difficulties affecting operational obligations, such as insurance and payroll and including, but not limited to, significant outstanding tax liabilities, including unpaid payroll taxes for an extended period; and a materially impaired fleet with a number of its buses not in service.[29]

16. The parties understood and contemplated that an acquisition of Western, if agreed to, would need to be formalized in a written agreement executed by the parties.[30]

17. No formalized acquisition, or merger agreement between Western and any entity affiliated with Mr. Begovich was ever executed.[31]

18. The parties discussed a purchase of substantially all of Western's assets wherein Western would receive approximately $5.7 million net—representing the net value of the company and equipment—after Defendants paid off all bus notes (total acquisition value allegedly approximately $20–23 million).[32]

---

[27] *Id.* at 5 (emphasis added).

[28] Pl.'s Ex. 1.

[29] Mar. 6, 2026, PI Hearing Tr. at 151:10–13; 174:23–175:13.

[30] *Id.* at 152:23–153:3.

[31] Mar. 5, 2026, PI Hearing Tr. at 62:23–63:3.

[32] Mar. 6, 2026, PI Hearing Tr. at 127:3–18.

19. On June 26, 2025, Mervatt Eljaouhari, an attorney representing Mr. Begovich in the proposed transaction, emailed Harry Bao outlining a proposed interim structure consisting of a management agreement, a capital infusion secured by a promissory note, and related corporate documents until such a time as a purchase agreement could be drafted and a closing could occur.[33]

20. On June 30, 2025, Harry Bao responded to Ms. Eljaouhari's email stating Western was "comfortable moving forward" with that proposed structure, including a management agreement permitting Mr. Begovich and his entities to assume Western's day-to-day operations in exchange for a capital infusion secured by a promissory note.[34]

21. Harry Bao was aware Ms. Eljaouhari did not represent him or Western.[35]

22. Harry Bao knowingly and voluntarily, with full understanding of the possible consequences, chose to negotiate and enter into these agreements without his own attorney. In fact, he did negotiate better terms for Western and himself on various occasions during the proposed acquisition.[36]

23. Harry Bao did not immediately execute the agreements.[37]

24. On July 3, 2025, at 8:04 AM, Ms. Eljaouhari emailed documents to Harry Bao with the instruction, "We need these documents turned around to us by 8:30 in the morning in order to keep the wire in place."[38]

---

[33] Pl.'s Ex. 2.

[34] *Id.*

[35] Mar. 5, 2026, PI Hearing Tr. at 83:13–20. Mar. 6, 2026, PI Hearing Tr. at 138:20–139:12.

[36] Mar. 6, 2026, PI Hearing Tr. at 138:20–229:18–230:8.

[37] Pl.'s Ex. 2.

[38] Pl.'s Ex. 3.

25. The documents included Hoa Bao's resignation as Director and Secretary, a unanimous consent appointing Begovich as President, Director, and Secretary, a $300,000 promissory note personally guaranteed by Hoa Bao and Linh Hua, a stock pledge of 100% of Western's shares, and amended bylaws for Begovich's execution as incoming President.[39]

26. Western signed and returned the documents.[40]

27. No management agreement existed between Western and Anaken Holdings, LLC wherein operational control of Western would have been transferred to Mr. Begovich, because Mr. Begovich never executed any such agreement. Harry Bao's prior sworn statement to the contrary is incorrect.[41]

28. By August 2025, the parties were no longer discussing a full acquisition of Western, but rather something more like an asset purchase agreement.[42]

29. Eventually, Mr. Begovich informed Western that the acquisition was no longer going forward.[43]

### III. Conclusions of Law

Four elements must be proven before a court will issue a preliminary injunction: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is denied; (3) the threatened injury to the movant outweighs the injury to the nonmovant; and (4) granting the injunction will not disserve the public interest.[44] If the movant fails to meet

---

[39] Mar. 5, 2026, PI Hearing Tr. at 65:1–18. Mar. 6, 2026, PI Hearing Tr. at 238:12–17.

[40] Mar. 6, 2026, PI Hearing Tr. at 238:23–239:3.

[41] *Id.* at 165:15–22.

[42] *Id.* at 152:7–19.

[43] Mar. 5, 2026, PI Hearing Tr. at 67:9–14.

[44] *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195–96 (5th Cir. 2003) (citing *Canal Auth. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)).

its burden regarding any one of the necessary elements, a court need not address the other elements necessary for granting a preliminary injunction.[45] At all times, the burden of persuasion remains on the movant as to each of these four elements.[46]

Whether to grant or to deny a preliminary injunction is within the discretion of the trial court,[47] but "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule."[48] Regardless of whether the request for injunctive relief is granted or denied, Federal Rule of Civil Procedure 52(a) requires the Court to "state the findings of fact and conclusions of law that support its action."[49]

### IV. Analysis

Western asserts that Mr. Begovich breached and continues to breach fiduciary duties owed to Western as its alleged president, and that the Begovich Entities breached the NDA by allegedly poaching Western's employees and soliciting Western's customers, which the Begovich Entities allegedly learned of through confidential information disclosed pursuant to the NDA. The Court addresses each claim in turn.

As an initial matter, the underlying NDA states that, "[t]his agreement, and all claims hereunder shall be governed by and construed in accordance with the laws of the State of Louisiana, without giving effect to the principles of conflicts of laws that would require or permit

---

[45] *See Roho, Inc. v. Marquis*, 902 F.2d 356, 361 (5th Cir. 1990) (declining to address the remaining elements necessary to obtain a preliminary injunction after finding that plaintiff failed to show a substantial likelihood of success on the merits); *see also Barton v. Huerta*, 613 F. App'x 426, 427 (5th Cir. 2015) ("[F]ailure to succeed on any one of the elements results in a denial of injunctive relief.").

[46] *Callaway*, 489 F.2d at 573 (vacating an injunction where the district court improperly placed the burden of persuasion on the defendants to prove the injunction should not be granted, rather than requiring plaintiffs to carry their burden).

[47] *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir. 1984).

[48] *Miss. Power & Light*, 760 F.2d at 621 (5th Cir. 1985).

[49] Fed. R. Civ. P. 52(a)(1), (2).

8

the application of the laws of any other jurisdiction."[50] As such, the Court shall apply Louisiana law herein.

### A.    Likelihood of Success on the Merits

#### 1.    Breach of Fiduciary Duties

Western claims that Mr. Begovich breached his fiduciary duties to Western when he caused or directed the removal of insurance coverage from multiple buses Western owns outright, and Western asserts it cannot lawfully operate without required insurance.[51]

To prove a breach of fiduciary duty, the movant must show (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant breached his fiduciary duty to the plaintiff; and (3) the defendant's breach results in injury to the plaintiff or benefit to the defendant.[52]

Based on the evidence presented at the preliminary injunction hearing, Western has not shown a likelihood of success on the merits for the breach of fiduciary duty claim. Specifically, Western has not established that a fiduciary relationship existed between Western and Mr. Begovich. In fact, the underlying NDA provides, "there is no fiduciary relationship or other implied obligation of either Party or any of their affiliates with respect to the subject matter hereof or based on any course of dealing…"[53] Moreover, although Plaintiff claims it signed over management responsibility to Mr. Begovich, the evidence presented during the hearing shows that Mr. Begovich never executed the management agreement. The lack of a fiduciary relationship weighs against a finding that Western is likely to prevail on the merits.

---

[50] Rec. Doc. 29-1 at 7.

[51] Mar. 5, 2026, PI Hearing Tr. at 23:11–14. Mar. 6, 2026, PI Hearing Tr. at 128:18–129:3.

[52] *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007).

[53] Rec. Doc. 29-1 at 7.

### 2.    Breach of NDA

Western asserts that Begovich Entities breached the NDA by allegedly poaching Western's employees and soliciting Western's customers, which the Begovich Entities allegedly learned of through confidential information disclosed pursuant to the NDA. Like any breach of contract, a cause of action for breach of a non-disclosure agreement requires proof by a preponderance of the evidence that: (1) defendant owed him an obligation; (2) defendant failed to perform the obligation; and (3) defendant's failure to perform resulted in damage to the plaintiff.[54]

However, the NDA at issue does not contain an express non-compete or non-solicitation provision. The plain language of the NDA governs only the use and disclosure of confidential information, it does not prohibit recruiting or hiring of Western's employees. Accordingly, on the present record, Western has not demonstrated a substantial likelihood of success on its breach of NDA claim.

### B.    *Irreparable Harm*

Western asserts that it will suffer irreparable injury if Mr. Begovich is allowed to solicit customers from Western's customer list, which was allegedly disclosed under the NDA. Western argues that this amounts to a breach of the NDA. Western claims that Section 11 of the NDA allegedly acknowledges that a breach "will cause irreparable harm for which monetary damages are an inadequate remedy" and allegedly entitles the disclosing party to "seek injunctive relief and specific performance." Western also alleges it faces injuries including harm to its credit, loss of customers, employee departures, and greater difficulty in obtaining insurance coverage.

---

[54] *Hayes Fund for the First United Methodist Church of Welsh, L.L.C. v. Kerr–McGee Rocky Mt., L.L.C.*, 14-2592 (La. 12/8/15), 193 So.3d 1110, 1115; *Mouton v. Generac Power Sys.*, 14-350 (La. App. 3 Cir. 11/5/14), 152 So.3d 985, 997.

Collectively, Western argues that these consequences amount to permanent irreparable injury to its market position due to the loss of customer relationships, goodwill, and harm to its credit score.[55]

"In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages."[56] Where a district court has determined that a meaningful decision on the merits would be impossible without an injunction, "the district court may maintain the status quo and issue a preliminary injunction to protect a remedy, including a damages remedy, when the freezing of the assets is limited to the property in dispute or its direct, traceable proceeds."[57] The Fifth Circuit has opined that "loss of business opportunities, goodwill, customer relations, and erosion of market position are potentially irreparable injuries warranting injunctive relief."[58] Particularly, the Fifth Circuit has recognized that a "finding of irreparable harm is appropriate even where economic rights are involved," when calculating the dollar value of the loss is especially difficult or speculative such as the damage to the goodwill of customers.[59] This type of reputational injury may be used to establish irreparable harm, "but the showing of injury must be more than speculative."[60]

Western claims to have lost several contracts due to the Begovich Entities' actions including, a contract with a company called Anthony Travel and a FIFA contract worth

---

[55] Mar. 5, 2026, PI Hearing Tr. at 21:2–16, 22:8–16, 40:11–14.

[56] *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (citing *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981)).

[57] *Id.* (citing *Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*, 621 F.2d 683, 686–87 (5th Cir. 1980)).

[58] *Tribal Sols. Grp., LLC v. Valandra*, No. 23-60233, 2023 WL 7314308, at *2 (5th Cir. Nov. 6, 2023).

[59] *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, n.1 (5th Cir. 1989).

[60] *Tribal Sols. Grp., LLC*, 2023 WL 7314308, at *2.

approximately $1.5 million.[61] At the preliminary injunction hearing, Western offered a letter from AMS, drafted at Mr. Begovich's direction, which assured its customer, Anthony Travel, that it would continue to receive services by Western while AMS was in the process of acquiring Western.[62] Harry Bao testified that he requested the letter from Mr. Begovich to ensure Anthony Travel paid Western for services rendered.[63] However, Western provides no evidence, aside from Harry Bao's testimony, to support its assertion that it has lost business since the acquisition discussions began, much less that such a loss was caused by the Begovich Entities' actions. Even if Western could establish that it will suffer injury to the goodwill of its customers, the dollar value of such damages here is not speculative. Western admitted that as recently as January 2026, it was prepared to be acquired by the Begovich Entities for approximately $5.7 million, plus the cost to pay off many of the loans encumbering Western's buses.[64] Specifically, Harry Bao testified that he believed that the Begovich Entities were going to provide approximately $22-$23 million in funding to acquire Western, and that he expected to receive about $5.7 million after the rest of the funds went toward paying off some of Western's loans.[65]

Turning to the alleged harm to Western's credit, Western alleges that several of its buses, which are financed by Atlantic Union Bank and in the Begovich Entities' possession, are delinquent, resulting in ongoing harm to Western's credit.[66] The Supreme Court recognizes that, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later

---

[61] Mar. 5, 2026, PI Hearing Tr. at 16:16–20.

[62] Rec. Doc. 29-4.

[63] Mar. 5, 2026, PI Hearing Tr. at 75:1–19; Mar. 6, 2026, PI Hearing Tr. at 180:14–181:22.

[64] Mar. 6, 2026, PI Hearing Tr. at 127:3–16.

[65] *Id.* at 127:11–18.

[66] Mar. 5, 2026, PI Hearing Tr. at 15:4–18.

date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."[67] Further, courts routinely hold that harm to a party's credit score does not amount to irreparable damage to goodwill, when that party has made only conclusory assertions that its reputation will be impacted.[68] Thus, Western had not met its burden of establishing that the alleged credit harm amounts to irreparable harm.

Western's goal at the outset of this derailed business acquisition was to eventually transfer ownership in all of its assets to the Begovich Entities for a net value of approximately $5.7 million. In the Complaint, Western seeks over $18 million in damages.[69] Thus, if Western is successful at trial in obtaining these monetary damages, it will be in as good or better position as it would have been in if the acquisition had closed. Accordingly, the Court finds that at this stage of the proceeding Western has not met its burden of establishing that it will suffer irreparable harm if the preliminary injunction is not issued, because a successful trial on the merits could yield it the amount of money it originally sought, plus whatever additional compensable damages may arise through litigation.

## C.    *Balance of Harms*

Western seeks relief that would effectively prohibit Begovich Entities from employing or soliciting certain individuals, from soliciting Western's customers, and from operating using Western's name and logos, amongst other relief. Granting such relief would impose restrictions

---

[67] *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

[68] *Williams v. Transworld*, 25-9527, 2025 WL 3295330, at *2 (N.D. Cal. Nov. 26, 2025); *Shelton v. Kilma, Peters & Daly, P.A.*, 24-1068, 2025 WL 1311731, at *5 (D. Md. May 6, 2025) (Denying a TRO where the plaintiff did not show "how continued reporting will cause harm that is distinct from the harm she allegedly already suffered."); *Williams v. Capital One, N.A.*, 25-980, 2025 WL 2388683, at *2 (E.D. Cal. Aug. 18, 2025) (holding that credit harm can be remedied through damages and a subsequent order from the court to remove the disputed debt from the plaintiff's credit report).

[69] Rec. Doc. 3 at 88.

on Begovich Entities' business operations that the parties did not agree to in the NDA. An injunction limiting Begovich Entities' ability to recruit or retain employees and customers would risk restricting lawful competition in a manner disfavored under Louisiana law. By contrast, as stated above, Western's harm is largely economic in nature and compensable through damages. Moreover, Western didn't establish during the preliminary injunction hearing that its loss of employees or customers was the result of anything done by the Begovich Entities. As a result, the balance of equities does not favor Western.

### D.    *Public Interest*

Louisiana has a strong public policy against restraints on trade. Courts therefore exercise caution in enforcing agreements or granting relief that restricts competition beyond the express terms of the contract.[70] Granting the requested injunction would effectively create a non-solicitation and non-competition restriction where none exists in the parties' agreement, running counter to Louisiana's public policy. Accordingly, the Court finds that the public interest would not be served by the issuance of a preliminary injunction in this case.

### V. Conclusion

For the reasons stated herein, the Court finds that Western has not carried its burden, at this stage of the proceeding, of demonstrating entitlement to the extraordinary remedy of a preliminary injunction.

Accordingly,

---

[70] *See Paradigm Health Sys., L.L.C. v. Faust*, 2016-1276 (La. App. 1 Cir. 4/12/17), 218 So. 3d 1068, 1072 ("Historically, Louisiana has disfavored noncompetition agreements. Such agreements are deemed to be against public policy, except under the limited circumstances delineated by statute.").

14

**IT IS HEREBY ORDERED** that Western's Motion for Preliminary Injunction[71] is **DENIED**.

**NEW ORLEANS, LOUISIANA**, this ___10th___ day of April, 2026.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[71] Rec. Doc. 1.

15